May it please the Court, my name is Lewis Chip Edelson, and I represent William Tuma, the plaintiff appellant. As the panel is aware, this case arises from a summary judgment. Despite the district court expressly finding, as stated in his orders, that Mr. Tuma presented substantial evidence showing, A, he was the procuring cause of a very large long-term purchase agreement with the world's largest spa manufacturer, Watkins, and despite Mr. Tuma presenting sufficient evidence showing, B, he was terminated as a salesperson by Eaton in bad faith for the specific purpose of depriving him of any commission whatsoever. He received zero compensation for four years of work. Now, despite those specific findings, the Court entered summary judgment. Now, today, I plan to emphasize three factual points that distinguish this case from the many other commission cases that are out there, and I'm going to emphasize and clarify two legal points that are not really focused on or even mentioned in the briefs but are discussed in the district court's order. Factually, and this is key, Mr. Tuma had fully performed. He had no further duties or responsibilities with respect to this Watkins long-term purchasing agreement, unlike all those other commission cases, including one that Justice Clifton wrote. No justices here. Just judges. All right. Judge Clifton. In a case I'll get to later, the Boesinger v. Belden case that was not published and it was not with oral argument, but there it was stressed how there were ongoing duties. And that makes sense because when an employee or an independent salesperson has ongoing duties Relate that to the contract in this case. I mean, I can understand your client wishes he'd signed a different contract. The contract in this case does not provide for payment of commission based on contracts period of time after termination. There's a specific tail period provided in this contract, and that's the contract he signed. The contract he did sign it. It's a form contract and 90 percent. The part that applied to him, Exhibit C, talks specifically. The whole thing applied to him. He signed the whole contract. He didn't just apply Exhibit C. And the contract says what it says. So as you're relating your facts, I think it's important for you to relate it back to the terms of this contract. Because it seems to me the contract doesn't give him a lot of support. If it did, you'd be making a different argument. Right, Your Honor. The contract does not give him a lot of support, but it does not give Eaton a lot of support either. It's a form document, and the key provision relied on by Eaton and the district court is the Section 15 on termination. It talks about orders. You have to evaluate the contract as it was negotiated or not negotiated, but at the time of contracting. Mr. Tuma, and the evidence is clear on this, his primary purpose was to bring in Watkins, a long-term multiyear purchase agreement. His job was not to place orders. There is in the contract language about orders that absolutely he signed it. It would apply to him if he, in the course of trying to bring in Watkins, obtained a one-off order from some other manufacturer. Then, yes, that 30-day tail would apply to him, and it would make sense. But on the long-term purchase agreement, he didn't get paid on orders. His Exhibit C says he gets paid on invoices. Under those circumstances, it was clear. First, he had to bring Watkins to the table, get them to try the Eaton products rather than be exclusive to the General Electric circuit breakers. Then, once they got to that, they had to negotiate the long-term agreement, they meaning not Mr. Tuma, but Eaton. And then Eaton's representatives had to negotiate and follow up with the customer, Watkins, to obtain the individual orders. That was not what Mr. Tuma was to do. And our evidence was clear. So why did he sign a contract that tied the commissions to orders? The evidence is that he negotiated with Mr. Hulse, his immediate supervisor. They reached an agreement that they wanted him to go after Watkins, his former employer. And they then sent him other people, not the people that negotiated directly with Mr. Tuma. People back in the East sent him this form agreement. But it did have Exhibit C talking about his commission. He had asked for a 10 percent commission. They gave him a 10 percent commission, except they modified that to say that was just for first-year business. He got 5 percent on later business. It did not seem to be a problem. I'm sorry. That in the contract? Yes, it is. I'm looking at the language in Exhibit C, and I don't see what you just told me. Yes. In Exhibit C, Your Honor, it says his commission shall be paid on invoicing. It says he will get 5 percent of invoiced amounts, and then 10 percent of invoiced amounts payable on incremental invoices above existing business. So in the first year, new business would all be business that was not existing, and so 10 percent. And this isn't even an issue in the case or dispute. So the focus in the negotiations was what is my commission rate going to be, 5 percent, 10 percent, what percent? And they came back with this and gave him close to what he asked for. It was all right. And in the form contract, he saw nothing that bothered him. He did not believe orders applied to him. And then there's the note here at the bottom of Exhibit C that for long-term, multiyear purchasing contracts, Cutler Hammer or Eaton, as they acquired it, reserved the right at the time of quote to modify the agreement. Now, the time of quote was over those four years when Mr. Tuma went to Eaton and said, what pricing can we quote to Watkins? That's when there should have been any modification. The reason this is important, Your Honor, and why I stress that he had fully performed, is that 30-day tail, unlike all the other cases that had one, gave him absolutely no protection, because after spending the years to bring Watkins to the table, it was inevitable that it was going to take a long period of time to then have them test Eaton circuit breakers, then if they agreed with that, to work out through Eaton the terms of the long-term purchase agreement, then once that was done, to have anybody enter an order and get an invoice. In fact, the facts of this case show that Mr. Tuma was told in August of 2006 by Watkins, you've won our business if we test it out and it works. In February of the following year, 07, Watkins announced to everyone, GE, you've lost the business. Eaton, Mr. Tuma, you've won the business. Then Mr. Tuma was terminated in November of 07, and it wasn't until March of 08, a whole other many months later, that the agreement was finalized. And so a 30-day tale, when it takes years to bring someone to the table, these agreements, and it's in evidence, typically there's a lot of barriers. So why isn't this an explanation as to why he signed a bad contract, that the contract doesn't protect him for what actually happened? The question I originally posed is, why did he sign this contract? And you give me a lengthy explanation, in essence, as to how it doesn't really fit this situation, but we still come back to the problem, that's the contract that's been signed between the parties. It does not provide for anything more than the tale provision of 30 days in terms of payment of commission. Obviously, in hindsight, it's a very poor contract. He did sign it. Both parties signed it. But the key to interpretation is, what were their expectations reasonably at the time of contracting? So there was the expectation that there would be an arrangement to put in place for the long-term multi-year purchasing, and my point is simply, the form language talking about orders is not at all applicable to the Watkins long-term multi-year purchasing arrangement. But if you just told me that was the principal reason he was hired, if he decides to sign a contract that has a round hole and he's got a square peg, I'm not sure why it's our responsibility to adjust the size of the hole to fit his peg. It's not, and the law is clear that parties cannot ask the court to rewrite contracts, even very bad contracts. My point is, applying rules of interpretation to avoid absurd, harsh, forfeiture type of results, you have to consider all the circumstances, consider extrinsic evidence not foreclosed, and what I'm pointing to the court is the evidence showed that the form language merely was inapplicable to his situation. Looking at the language in Exhibit C, is there a difference between using Exhibit C language, sales made under the Watkins pricing agreement, and orders placed pursuant to that agreement, using the language of the termination? There is, Your Honor. Explain that. The evidence that we submitted showed that Mr. Tuma was the only independent sales representative anyone had heard of at Eaton, and the difference was all the others, the employee sales reps, they go out to solicit orders. Tuma was going for Watkins to bring them to the table to just establish their relationship,  His job was not, once they negotiated the agreement, to keep going out to negotiate and solicit orders. And so he was there to obtain the agreement. Now, I'm not going to defend the language used in the contract. It's not a carefully worded, applicable contract. Are we applying California law here? Absolutely, Your Honor. No doubt about it. So what, is there any case in California that we could look to for guidance where the language of the contract appears to be clear, and yet in the circumstances it reaches what seems to be a rather unfair result? What case do we? Absolutely, Your Honor, and I'm glad you asked the question, because let's assume, Your Honor, I'm not going to change your mind that the contract is clear and unambiguous the way the district court found. All right, so let's move on beyond that. In California, there are two areas. One area is our primary, strongest argument, bad faith, breach of the implied covenant, and unconscionability. On breach of the implied covenant, our district court said it's a closed question and it's a case of first impression. I disagree with both of those points, because in California, first off, there is the Wholesale Sales Representative Contractual Relations Act that specifically tries to protect people such as Mr. Tuma. There's also a similar act for employees. It gives special protection. Secondly, in Gould v. Maryland South that we cite, the California courts have held that it's not just bad faith. It's a tort for breach, for wrongful termination in violation of public policy to terminate an employee for purposes of depriving them of compensation, specifically commission, under a contract. So even if you have a clear contract that says we can terminate you at will, and if we do. But the premise of that is it's got a contract we're entitled to a commission. And the reason we're talking about bad faith is we don't have a contract that talks about commission. We've got a contract that talks about or whether we've got a contract that talks about commission, but not in a way that helps your client. He wasn't terminated to avoid paying him for a sale and order in the terms of the contract that was negotiated. They didn't delay the order to be outside the 30-day period, for example. The problem, again, is that the order, your client argues that he was looking for a long-term deal, and he signed a contract that provides for orders and commission on orders. Is there any California case you can point us to that suggests that the contract that he signed is unconscionable? Yes, Your Honor. Absolutely. In fact, there is a split of authority that can be interpreted that way. And Ellis v. McKinnon Broadcasting, Justice Weiner from my town, San Diego, found that if there's a clear and unambiguous agreement that provides for cutting off commission upon termination, it's clear, it's unambiguous, it's unconscionable. What's unconscionable? The contract as a whole surely is not unconscionable. I mean, California's recognized tail contracts. Cutting off commissions that have been earned. Yes. That's unconscionable. And the Court there did not get into the distinction of when is it earned. If the employee had – they got into the point of had the employee fully performed, was there more for the employee to perform, as in the Boesinger case? If yes, then it makes sense that the employer's not going to pay some salesperson when there's more to be done. But if, as here, there's 100 percent performance, nothing more for Mr. Tooma to be done, it's unconscionable to then say he gets nothing for four years of work. Ellis recognized that. This Court in Dana-Perfumes, it's an older case that we cite, 268 F. 2, 936 from 1959, similarly said it's unconscionable. Now, in the American Software v. Ali case and the Boesinger case, which are the two relied on by Respondent, those went the other way. What is unconscionable? What is the provision of the contract that is unconscionable? The provision, if you interpret the contract to say you do not get paid on commissions following termination or 30 days following termination. And if in those circumstances that results in giving the discretion to the company to terminate someone in bad faith so that they can then get zero, that provision is unconscionable. That's not a provision. There's a provision in this contract that says, upon termination we will only pay you for invoices received within 30 days. That provision is unconscionable if that allows Eaton to discretionarily in bad faith terminate Mr. Tuma for the purpose of paying him nothing, because in reality none of those orders are going to come in within 30 days. How do you explain the language in Exhibit C that is somewhat restrictive by saying that Eaton is reserving the right to come up with this special commission rate? It seems to me that they were preparing for a lesser commission rate for orders that might be placed under a long-term contract by putting that language in, but it seems discretionary, and that's the whole of your breach of contract theory, I think. Right. It is discretionary. I think, Your Honor, you're right. They were preparing for that. Their obligation and their only contractual right to exercise that discretion was not retroactively. It was at the time of quote. That's what it says. And not only is that what it says, but the law recognizes that you can't exercise your discretion after the fact. I'm out of time, but I will say there's a whole other line of cases about exercising discretion. Even if you have the right, and I realize I'm giving a part of my time. We'll give you a minute for rebuttal, but don't use it all now. Your Honor, there's a whole line of California cases not discussed by Eaton or the district court that recognize that even where a party has discretion to terminate and cut off commissions, it must be exercised in good faith, not for the specific purpose of having someone lose the only purpose to their contract. Here, they exercise that discretion, and the district court recognized we had evidence. They did it just to cause him to get paid zero commissions. So even if you interpret the contract the way the district court did, that's bad faith, that bad faith exercise of discretion. Thank you. We'll hear from counsel for Eaton. Good morning, Your Honor. May it please the Court. Robert Reese for Eaton Corporation. First time I've ever been here. You're welcome. Thank you. The Court, I mean, Eaton's position is clear. The Court's job is to enforce the party's bargain and to follow it, not to rewrite it, and that's exactly what they want to do. Before going into my prepared remarks, a couple of things I want to point out. They say that it's absolutely clear that Mr. Toomey was a procuring cause, and it's absolutely clear. Well, except this is a summary judgment. And so when counsel has used language suggesting affirmative demonstration, our only concern is whether there is evidence that might be enough for a jury or a judge to so decide. So you don't have to concede or try to present a trial case now. But we are on summary judgment. And so we have to accept the fact there was evidence supportive of some of those propositions. Understood. But neither of those propositions changes the analysis that the lower court made. They said this is a clear, unambiguous agreement. And it said it can be terminated by either side on 30 days' notice without cause. And they would get not only those 30 days for orders received or accepted, but an additional 30-day tail period. Tail periods are well established in the law as not unconscionable. And they're very rational because they create a bright line for the salesperson and the companies to when a commission has or hasn't been heard. Now, they focus a lot on this Exhibit C and the fact that for a long-term agreement, Eaton has the discretion to modify the contract, but only modify the rate. It never says Eaton has the right to modify how orders are triggered. So when they say it's clear that there's full performance, there hasn't been any performance because there hasn't even been a pricing agreement. He thinks, and it's clear in their brief, that in February of 07, the commission was fully earned and fully payable 100 percent. That's what they say. But look at all the things that had to happen after that, the reliability testing during the summer. And in August, if the court looks at Exhibit 380, there's an e-mail after Brian Hulse goes to lunch with Mr. Tuma and says, you know, it's Eaton's position that we got the Watkins work independent of you. And so we're going to have to do that. But I don't know how that really helps you for the current purpose, which is summary judgment. Okay. I mean, at least the circumstances strike me as supporting the proposition that plaintiff was hired not to go collect orders on a daily basis, but to cultivate a long-term relationship with a potentially very large customer. And there are lots of circumstances. There are businesses where sales representatives or marketing people focus entirely on trying to cultivate a relationship which may bear fruit someday, but doesn't bear any fruit while you're doing the cultivation. Well, this contract doesn't speak clearly to that. You can imagine a contract that does. Moving a little bit away from the factual dispute, I want to know what's the best authority you can offer to us. I mean, Judge Schroeder posed a question about what California cases support plaintiff's argument. And I'm interested in the converse. What is it that supports the proposition accepting plaintiff's argument that his major function was to cultivate a relationship? At the end of the day, there are some green shoots appearing, and at that point, he's cut off before he can actually harvest anything. What supports the proposition that he's not entitled to any commission because the actual orders weren't placed until after they got rid of him? Well, I guess the problem I'm having is with the evidence that he suggests exists that that was the purpose of the contract is contradicted by the written terms of the contract. The contract doesn't say anything about he's hired for one purpose. It says you're hired for the contract. Well, the contract doesn't necessarily – his argument is that the contract doesn't fit the situation. And I have to say, looking at it, it's not like he was producing large numbers of orders for Eaton in the first few years of his relationship with Eaton. And even if he was producing some level of orders, it's not implausible, as he attests, and that's enough, I think, to make a genuine issue that he, in fact, was mostly devoted to trying to cultivate this long-term relationship with a company that he formerly worked for. But all I'm saying is that's not in the record. There's nothing in the record to suggest his after-the-fact view. There's nothing, no facts that he can point to. What about his own statement? His own statement is a self-serving after-the-fact view. It's an evidence. It's contradicted by the language. But it's an evidence. At summary judgment, it's not for the Court to decide whose facts are right. So I ask you once again, try not to argue the facts to us. And this is what the Court said in its many opinions. And by the way – There's a reason why the Court said that, because it's summary judgment. But I guess my point is, this California court, California law, he didn't make a quick and dirty decision. He granted summary judgment. Then he gave them oral argument and rewrote his opinion. Then he gave them additional reconsideration and rewrote his opinion. It's a very thoughtful, careful opinion. And what he said on the point about, even if the decision was done in bad faith, it was still done according to the express agreed-upon terms of the contract, and you can't go behind that to look at the motivation. Motivation. So I'll return to my question. Can you point us to authority that supports that legal proposition? That is, that even if there was bad faith, the contract is the end of the story. Yeah. In the implied covenant area, there's the Wolf case and there's some authority from Washington, the – I believe it's Chamberlain and Cable case and – that would say if the part – if something isn't allowed by the contract, then it's enforceable. The Bowser-Wolf Associates case, 753F2nd. Well, but as – but if I understand – I may not understand the California law, but my understanding of California law is that if you terminate someone in order to prevent that person from getting what the contract authorizes him to get, then that's bad faith. No, that's not. And that's – again, if you look at those cases in the Wolf-Disney case, which happened to be my old firm's case. The other case that's relevant is the Nine case, N-E-I-N, because there they terminated somebody in December. They signed a deal in – and there was no tail period in the Nine case, and they signed a deal with AT&T, a very lucrative deal, in January. And like a month later, not a whole year later like in this case, and the court said that's not unconscionable, that's what the law provides or the contract provides, and we're not going to rewrite the contract. So I think that's a very relevant case. There's nothing they can point to. The two cases that they talk about in the bad faith arena, one is the IndyMac case, and that's a very different factual situation because there the bad faith conduct was unforeseeable by any of the parties. That is, that the FDIC would say, give us all 500 files within 30 days on an insurance case. That's not similar to what happened here. Here what happened was entirely foreseeable. It's foreseeable that you're going to terminate a sales rep. It's foreseeable that he will have solicited people that have not matured into an order yet, and it's entirely foreseeable and a good idea to create a bright line so we can say, okay, when the orders come in, if they're on this side of the line, you get paid, even if we've already terminated you. On the other side, you don't get paid. That's the difference. And the other case they point to is the Sandra Locke case where Sandra Locke has a deal with Warner Brothers to, and they have discretion to pass on her projects or accept them. And they don't accept any of her projects, and they don't give her any reasoning, and they say there it's at least a fact issue as to whether or not they were absolutely not exercising discretion but absolutely making a rule to somehow cheat her out of her commission. There's no evidence of that in this case, certainly other than his self-serving testimony. Well, there's the chronology. What's that? It's the chronology. And his argument is he's not saying, and you're right, I haven't seen affirmative evidence on the side of the thought pattern of the Eaton officials who made the decision. But chronology by itself may permit an inference. Well, even his chronology is flawed because he says that in February of 07, Connie Welch, who's a purchasing manager but not a decision maker on the switch, issues a letter to one source saying we're going to go to Eaton. And he says at that point he gets 100 percent of the commission in perpetuity even though there's nothing that suggests or supports that in the written agreement he signed. He wasn't a novice when he signed that. He had seen these agreements. He said it was a standard agreement. It was perfectly acceptable. He didn't take it to a lawyer. He knew what the agreement was. There was a lot that could have happened, and there's a big vacuum in the record from the appellant's side as to how from that letter in 07 it took over a year to get a pricing agreement and then another month beyond that. What had to happen? Eaton had to demonstrate reliability. He had no role in that. And, in fact, if you look at his conduct in July of 07, Watkins places an order for $25,000 worth of parts to test, and they order it through one source. He's very good at writing self-serving e-mails. Where's the self-serving e-mail that says, hey, this is contrary to the agreement. You owe me money on this transaction. You can't just buy through one source. You owe me. A month later they tell him, it's our view that we independently, and this is what Exhibit 380 says, that Brian Holtz has lunch with him. Brian Holtz says, you know, we're terminating you as a sales rep. And, again, that notice of termination, there's no deal in place with Watkins that they're just sitting on. It's not like they have it in their back pocket and they're trying to do it. They say, it's our view that we independently obtain the Watkins business. That's that Exhibit 380. And he, again, doesn't write any kind of self-serving memo. Oh, by the way, I disagree with you. You're going to terminate me, but you owe me money on any Watkins deal. Mr. Reese, when could Eaton have exercised discretion under Exhibit C? It says, of course, that they reserve the right to establish a project commission as a project-specific commission rate at the time of quote for sales made under this particular agreement. Right. When is that, or is that not clear in the record? Well, I don't know if it's clear in the record, but he had made multiple quotes to Watkins over the years. It's not that, and none of those quotes were ever even accepted, because the pricing agreement, by definition, was a three-party agreement between Watkins, One Source, and Eaton, and totally unrelated to any of the quotes that he had earlier given to them. It's not like he gave a quote and they said, So under that language, Eaton could have negotiated a commission rate any time a quote was made? Right, but the commission rate is not the issue in this case, and it wasn't the issue for the lower court. The issue for the lower court was, what's the trigger for when a commission is owed? They say he fully performed, and the trigger was getting a letter from a non-decision maker who had no authority to switch the business. But Tula says that Eaton exercised that discretion in bad faith. That's why it is more of an important matter to this appeal. Eaton has not exercised any discretion. What they say was in bad faith was terminating him, and that they had a clear right under the agreement to do. It said either party may terminate under 30 days. So Eaton followed the contract. Eaton did everything they were not just permitted to do under the contract, but despite their kind of argument, it doesn't have any foundational support. And you can look at the terminology. And I understand how a jury might look at it a different way and how the court looked at it a different way. But the termination was after he had worked for four years, and it was less, it was only a few months before the actual purchasing agreement was entered into. It was six months before the end. More than six months, actually. And there were a lot of things that could have gone wrong. And after he had worked for four years. Well, okay. He had done events over a period of four years. It was not day-to-day slaving for four years and constant this. And that's not in the record. The nature of his four years of work is not in the record. Any other questions? Let me explore one issue with you just quickly. Just assume an argument that I think this argument is being made by the plaintiff in the case that Eaton did not exercise its discretion under Exhibit C, which it could have at a time when there was a quote for sales made. Because they didn't exercise their discretion, that act was in bad faith, therefore causing to me damages, which then brings in the Wholesale Sales Representatives Contractual Relations Act. Is that a plausible argument? No. Why not? Because the lower court's decision had nothing to do with discretion. In fact, as Your Honor correctly pointed out in the other argument, the discretion was to set a lower rate of commission. Their whole argument on the discretion under Exhibit C is Eaton stuck with a 10 percent rate or the rate structure here because they didn't exercise a lower rate structure. That's not what the decision of the lower court's decision was all about. They also say, well, Eaton has a discretionary, and this is in their briefs, a discretion to allocate commission between a distributor and a sales rep. Again, whether or not that any discretion that Eaton had under this agreement is irrelevant to the court's reasoning because the court's reasoning was this is strictly a matter of looking at time, looking at when the orders come in, and there's nothing extraneous to the contract, certainly nothing. First of all, because it's unambiguous, you don't look at anything extraneous to the contract. But even if you were going to, you'd have to look at extraneous stuff at the time it was created, and there's nothing in the record there. And the only course of performance by Mr. Tuma in July when he accepted the fact that the sale went through one source and in August when he was terminated without objection shows that Eaton performed under the contract. The lower court followed it, and I urge this Court to do the same. Thank you. Roberts. Thank you. Rebuttal? I'd like rebuttal if I could impose for another couple of minutes. Well, I said I'd give you one, and you used most half of it, so don't plan on a couple minutes. Yes, Your Honor. On contract interpretation, all I'll say is I believe we have extrinsic evidence of an alternative reasonable interpretation that the district court and Eaton's interpretation is not the only interpretation. More importantly, though, as Judge Schroeder commented about discretion and is it under California law permissible to exercise discretion to terminate a salesperson? Even though you can terminate at will for any reason, can you do it for a bad reason, specifically to cut off commissions or other compensation? And California says no. The Gold v. Maryland case says it's a tort. The Goose case, the Supreme Court footnoted that they would consider that issue, and it suggested it's a footnote, so it's dicta, but still suggested that that would be improper. The Karma case, the California Supreme Court then talks about even though a party has discretion to do such as terminate someone, you must exercise it in good faith. So the district court did not focus on that discretion, as Mr. Reese pointed out. It should have been done. Last, on unconscionability, the clause limiting payment to a 30-day tail is unconscionable if you interpret the agreement to apply to Mr. Tuma so that he gets zero, knowing under the circumstances of this case that it's going to take years to bring him to the table and a long period of time to negotiate and then more time to bring in orders. And last but not least, Judge Schroeder. You already said last and you've already more than used the time I gave you. The case just argued and submitted. We thank both counsel for your helpful arguments. We are in brief recess.
judges: Tunheim, Schroeder, Clifton